# Illinois Official Reports

## Appellate Court

---

**_Van Dyke v. White_, 2016 IL App (4th) 141109**

---

| | |
|---|---|
| Appellate Court Caption | RICHARD LEE VAN DYKE, d/b/a Dick Van Dyke Registered Investment Advisor, Plaintiff-Appellant, v. JESSE WHITE, in His Official Capacity as Illinois Secretary of State; THE ILLINOIS DEPARTMENT OF SECURITIES; and TANYA SOLOV, in Her Official Capacity as the Director of the Illinois Department of Securities, Defendants-Appellees. |
| District & No. | Fourth District<br>Docket No. 4-14-1109 |
| Rule 23 order filed<br>Rule 23 order withdrawn<br>Opinion filed | July 29, 2016<br><br>September 7, 2016<br>September 7, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 14-MR-305; the Hon. John W. Belz, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | William P. Hardy (argued), of Hinshaw & Culbertson LLP, of Springfield, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, and Christopher M.R. Turner (argued), Assistant Attorney General, of counsel), for appellees. |

E. King Poor, Gary R. Clark, and Charles E. Harper, all of Quarles & Brady LLP, of Chicago, for *amicus curiae* National Association for Fixed Annuities.

Kirk W. Dillard, Julie L. Young, and Hugh S. Balsam, all of Locke Lord LLP, of Chicago, for *amicus curiae* Fidelity & Guaranty Life Insurance Company and Indexed Annuity Leadership Council.

Christopher D. Galanos, of Quinn, Johnston, Henderson, Pretorius & Cerulo, of Springfield, *amicus curiae*.

Anne-Valerie Mirko, of North American Securities Administration Association, Inc., of Washington. D.C., *amicus curiae*.

| Panel | JUSTICE TURNER delivered the judgment of the court, with opinion. Justices Harris and Holder White concurred in the judgment and opinion. |
|---|---|

## OPINION

¶ 1      In March 2013, the Illinois Department of Securities (Department), under Illinois Secretary of State Jesse White (Secretary), filed a notice of hearing alleging plaintiff, Richard Lee Van Dyke, d/b/a Dick Van Dyke Registered Investment Advisor, defrauded clients by recommending the sale of indexed annuities in violation of Illinois law. In April 2014, the Secretary found Van Dyke committed fraud, revoked his investment-adviser registration, and imposed a fine and other costs. Thereafter, Van Dyke filed a complaint for administrative review. In December 2014, the circuit court affirmed the final administrative order.

¶ 2      On appeal, Van Dyke argues (1) the Department had no jurisdiction over the marketing and sale of indexed annuities by insurance producers; (2) the Department failed to prove fraud and acted arbitrarily; and (3) the fines and penalties imposed were arbitrary, excessive, contrary to the evidence, and inconsistent with fines imposed in other cases. We reverse the circuit court's decision and the Secretary's final order.

¶ 3                           I. BACKGROUND

¶ 4      At the relevant times in this case, Van Dyke was registered with the Department as an investment adviser. Investment advisers are regulated by the Department under the Illinois Securities Law of 1953 (Act) (815 ILCS 5/1 to 19 (West 2012)). Van Dyke was also licensed by the Illinois Department of Insurance as an insurance producer. Insurance producers are licensed and regulated by the Department of Insurance under the Illinois Insurance Code (215 ILCS 5/1 *et seq.* (West 2012)).

¶ 5        In March 2013, the Secretary filed a notice of hearing to determine whether Van Dyke's registration as an investment adviser should be retroactively revoked or suspended and whether he should be prohibited from offering or selling securities in the State of Illinois. As grounds for the proposed action, the Secretary alleged Van Dyke "defrauded over 21 clients, all of whom are senior citizens, of $263,822.13." The Secretary also alleged as follows:

> "Dick Van Dyke recommended and sold 31 transactions that resulted in the early surrender of Indexed Annuities in order to purchase new Indexed Annuities. For these transactions Dick Van Dyke received $160,937.05 in commissions but his clients lost $263,822.13 in surrender charges, penalties and other fees. In addition, Dick Van Dyke, in all but one transaction, had sold the surrendered Indexed Annuity and had received $155,341.51 in commissions from the transactions."

The Secretary stated all of the purchase transactions reviewed by the Department involved persons age 58 or older at the time of the transactions, with the oldest person being 82. The Secretary alleged Van Dyke violated sections 12(A), (F), (G), (I), and (J) of the Act (815 ILCS 5/12(A), (F), (G), (I), (J) (West 2012)).

¶ 6        Van Dyke filed a motion to dismiss, arguing the Department had no jurisdiction because section 2.14 of the Act (815 ILCS 5/2.14 (West 2012)) excluded indexed annuities from the Act's definition of "security" and because he did not act as an investment adviser. The hearing officer denied Van Dyke's motion, finding the indexed annuities were subject to the Act's provisions and the notice alleged sufficient facts to impose sanctions against Van Dyke as an investment adviser.

¶ 7        Evidence presented at the administrative hearing indicated Van Dyke prepared financial plans for clients, in which he provided investment advice and recommendations for the sale and purchase of financial products, including indexed annuities. For example, Van Dyke provided a financial plan to a client, in which he identified himself as a registered investment adviser, recommended the sale and purchase of various investments (including indexed annuities), and represented the summary was based on his professional opinion as a registered investment adviser.

¶ 8        The relevant financial contracts at issue here are equity-indexed annuities. In contrast to traditional fixed annuities, indexed annuities offer, in addition to a minimum annual return, a potential return on the account value that is tied through a formula to the performance of one or a combination of selected stock market indexes, such as the S&P (Standard & Poor's) 500 stock index, NASDAQ (National Association of Securities Dealers Automated Quotations)-100 index, or FTSE (Financial Times Stock Exchange) 100 index.

¶ 9        In March 2014, the hearing officer filed his report and recommendation. Therein, he found the documents disclosed that from February 2009 through October 2010, Van Dyke effected 33 indexed annuity purchase transactions involving the liquidation of 30 previously owned indexed annuity contracts by 21 of his clients, resulting in surrendered annuity contract commissions of $183,161.58, and $177,417.42 in new annuity contract commissions. The officer also found as follows:

> "Twenty-nine of the 30 previously-owned Indexed Annuity contracts had been recommended for purchase by [Van Dyke.] Five of 29 of the surrendered annuity contracts had eight years remaining until they could be surrendered without penalty, 20 contracts had seven years remaining until they could be surrendered without penalty. Surrender penalty charges ranged from $2,078.39 to $21,291.66. Six surrendered

contracts had bonus recapture fees that ranged from $2,232.01 to $8,940.48. Twenty-nine of the surrendered annuity contracts had positive market value adjustments. The contract value for the 30 surrendered Indexed Annuities totaled $2,327,904.95. However, the final amount credited to the 21 clients only totaled $2,246,897.59. Eleven of the 30 surrendered annuities resulted in eight clients having taxable income reported."

¶ 10 The hearing officer also found all but one of the 33 new indexed annuities featured higher fees and the start of new surrender penalty periods. Eight of the new contracts had 12-year surrender penalty periods, twenty-one had 10-year surrender penalty periods, and four had 6-year surrender penalty periods.

"Twenty-four of the new Indexed Annuities had 10% bonuses, eight had 5% bonuses, and one had an 8% bonus. However, four of the new Indexed Annuity contracts required the owners to wait 15 years before having access to the full bonus value upon surrender, seven had to wait 12 years, 14 had to wait for 10 years, and four had to wait for six years. The four Indexed Annuity contracts that did not have bonus recapture periods provided that the owner may receive less than the premiums paid if the annuity contracts were surrendered within the surrender penalty periods."

The hearing officer found all 33 transactions were solicited and made at Van Dyke's recommendation.

¶ 11 In his conclusions of law, the hearing officer found Van Dyke had violated section 12 of the Act, concluding Van Dyke's actions, statements, representations, and/or omissions tended to work a fraud or deceit on Illinois purchasers; were untrue or misleading; and were fraudulent, deceptive, or manipulative.

¶ 12 In April 2014, the Secretary issued a final order adopting, in relevant part, the hearing officer's recommended findings of fact and conclusions of law. Therein, the Secretary found Van Dyke was a registered investment adviser under the Act at all relevant times and "provided investment advice, financial planning and recommendations to purchase financial products including Indexed Annuities." As a registered investment adviser, Van Dyke was under a fiduciary duty to act in the best interests of his clients. The Secretary found the indexed annuities are securities under the Act that, although exempt from registration with the Department, are subject to other provisions of the Act.

¶ 13 The Secretary found the indexed annuity transactions "were both unsuitable and not in the best interests of the clients due to the age of the clients, the surrender penalties incurred due to the early liquidation of the existing Indexed Annuity contracts, the frequency of the commissions paid and no derivation of additional tax benefits." The Secretary found Van Dyke offered and sold at least 33 indexed annuities in violation of the Act and those transactions

"worked or tended to work a fraud or deceit upon the purchasers thereof by representing to and misleading [his] clients who liquidated an existing annuity contract to purchase a new annuity contract that the surrender penalty charges to be incurred would be recovered by a positive market value adjustment, that the new annuity contract provided favorable bonuses and interest thereon, and that the new annuity was a better investment over their current annuity and in the client's best interests."

Further, the Secretary found Van Dyke employed devices, schemes, or artifices to defraud in connection with the sale of securities by misleading his clients "that funds to purchase the new

annuity did not come from an existing annuity, and that there were not any settlement fees, surrender charges or penalties of any kind."

¶ 14    The Secretary found Van Dyke violated sections 12(A), (F), (G), (I), and (J) of the Act. The Secretary revoked Van Dyke's investment-adviser registration, permanently prohibited him from offering or selling securities in Illinois, fined him $330,000 ($10,000 for each replacement annuity), and ordered him to pay $23,500 as costs of the investigation and the expert witness.

¶ 15    In April 2014, Van Dyke filed a complaint for administrative review. Therein, Van Dyke argued the Secretary's decision was entered without jurisdiction and was contrary to the preponderance of the evidence.

¶ 16    On December 3, 2014, the circuit court affirmed the Secretary's final administrative order. On December 26, 2014, the court issued a corrected order *nunc pro tunc*. Therein, the court affirmed the administrative decision and stated, in part, as follows:

> "The Court finds the Plaintiff was a registered investment advisor and while acting in that capacity caused significant financial losses to his clients by false and misleading investment advice. Further, the Court finds the new equity indexed annuities are securities under the Securities Law as demonstrated by the character and nature of the annuities, including the manner in which the annuities were promoted and the risk assumed by the clients. The Court rejects the argument that the annuities in question are entitled to exemption from the securities law as a form of insurance. Additionally, the Court finds that the Plaintiff's conduct violated section [12(J)] of the Securities Law. Finally, the Court finds the record supports the findings made by the administrative law judge against the Plaintiff."

This appeal followed.

¶ 17                                II. ANALYSIS
¶ 18                            A. Standards of Review
¶ 19    On appeal, this court reviews the decision of the agency or department, not that of the circuit court. *Gruwell v. Department of Financial & Professional Regulation*, 406 Ill. App. 3d 283, 288, 943 N.E.2d 658, 664 (2010). In administrative review cases, reviewing courts may encounter "questions of fact, questions of law, and mixed questions of fact and law." *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210, 886 N.E.2d 1011, 1018 (2008).

> "An administrative agency's findings and conclusions on questions of fact are deemed *prima facie* true and correct. In examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of the agency. Instead, a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence. An administrative agency's factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident. [Citations.] In contrast, an agency's decision on a question of law is not binding on a reviewing court. For example, an agency's interpretation of the meaning of the language of a statute constitutes a pure question of law. Thus, the court's review is independent and not deferential." *Cinkus*, 228 Ill. 2d at 210, 886 N.E.2d at 1018.

"Mixed questions of fact and law are 'questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.' [Citation.]" *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577, 839 N.E.2d 479, 485 (2005). A decision on a mixed question of law and fact will not be reversed on appeal unless it is clearly erroneous. *Evans v. State of Illinois*, 2013 IL App (4th) 121082, ¶ 18, 13 N.E.3d 752. "A decision is 'clearly erroneous' when the reviewing court is left with the definite and firm conviction that a mistake has been committed. [Citations.]" *American Federation of State, County & Municipal Employees*, 216 Ill. 2d at 577-78, 839 N.E.2d at 485.

¶ 20                                B. The Act

¶ 21        "[T]he purpose of the [Act] is to protect innocent persons who might be induced to invest their money in speculative enterprises over which they have little control." *A.G. Edwards, Inc. v. Secretary of State*, 331 Ill. App. 3d 1101, 1110, 772 N.E.2d 362, 370 (2002). "The law is paternalistic and is to be liberally construed to better protect the public from deceit and fraud in the sale of securities." *Carpenter v. Exelon Enterprises Co.*, 399 Ill. App. 3d 330, 334, 927 N.E.2d 768, 772 (2010). To carry out these protections, section 12 of the Act prohibits fraudulent, deceptive, and manipulative conduct by investment advisers toward their clients. 815 ILCS 5/12 (West 2012). Section 8(E)(1)(g) of the Act permits the Secretary to deny, suspend, or revoke an investment adviser's registration for violations of any of the Act's provisions. 815 ILCS 5/8(E)(1)(g) (West 2012). Moreover, section 11(E)(4) of the Act authorizes the Secretary to impose fines and costs of an investigation against the violator. 815 ILCS 5/11(E)(4) (West 2012).

¶ 22                  C. Indexed Annuities as Securities Under the Act

¶ 23        Van Dyke argues the Department has no jurisdiction over the marketing and sale of indexed annuities by insurance producers and insurance companies authorized to transact business in Illinois. Van Dyke contends an indexed annuity is not a security under section 2.14 of the Act (815 ILCS 5/2.14 (West 2012)) and it falls under the authority of the Department of Insurance to regulate annuity policies. In his brief, he states as follows:

> "The Securities Department *has no experience or expertise* to regulate Van Dyke or any other insurance producer. It has no rules, regulations, standards, guidelines, or other relevant criteria necessary to evaluate whether an insurance producer is meeting the suitability requirements of a particular insurance client." (Emphasis in original.)

In their brief, defendants argue indexed annuities are securities under the Act. Defendants contend indexed annuities are investment contracts that pose significant investment risks to clients and raise considerations not involved in traditional annuities.

¶ 24        We find indexed annuities are not securities under the Act. Under section 2.1 of the Act (815 ILCS 5/2.1 (West 2012)), the term "security" is defined to include a "face-amount certificate." Section 2.14 of the Act (815 ILCS 5/2.14 (West 2012)) defines "face amount certificate" to include "any form of annuity contract (other than an annuity contract issued by a life insurance company authorized to transact business in this State)." Here, the indexed annuities in question are annuities issued by insurance companies authorized to transact

business in Illinois. Thus, they are not securities under Illinois law. To hold otherwise would go against the plain language of the Act.

¶ 25    Our finding is bolstered by the fact the General Assembly declared variable annuities—which do not provide minimum guarantees and are the type of annuities most susceptible to being classified as securities—fall under the sole jurisdiction of the Department of Insurance. See 215 ILCS 5/245.24 (West 2012). It would make little sense for the legislature to place variable annuities out of the reach of the Securities Department but then subject annuity products such as indexed annuities to securities regulation.

¶ 26    We also note the Department's ruling that indexed annuities are securities lacks any reasoned explanation in its administrative order. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Securities & Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Arguments made for the first time on appeal may not be used to support the agency's action because "courts may not accept appellate counsel's post hoc rationalizations for agency action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

¶ 27    In the administrative order, the Secretary stated as follows:

>     "The Indexed Annuities that are the subject of this Matter are securities subject to the Act. Although an Indexed Annuity is exempt from registration with the Department, the offer or sale of an Indexed Annuity is still subject to the other provisions of the Act."

This is the Department's entire explanation as to why indexed annuities constitute securities.

¶ 28    "The necessity for administrative agencies to provide a statement of reasons *** is a fundamental principle of administrative law." *Brooks v. Atomic Energy Comm'n*, 476 F.2d 924, 926-27 (D.C. Cir. 1973). Here, however, the Department fails to explain what an indexed annuity is, why indexed annuities fall within the definition of "security," or why it departed from the statutory language that annuities issued by insurance companies fall outside the definition of "security" and are regulated instead as insurance products. Moreover, it should be noted the Department attempts to define securities to include indexed annuities in a disciplinary proceeding, as opposed to the rulemaking process that would be subject to comment and challenge.

¶ 29    Defendants note that, even if indexed annuities are not to be considered securities, the Secretary also determined Van Dyke violated section 12(J) of the Act (815 ILCS 5/12(J) (West 2012)) by engaging in fraudulent or manipulative conduct as an investment adviser, which does not require the sale of securities. According to section 12(J) of the Act, it is a violation for a person:

>     "When acting as an investment adviser, investment adviser representative, or federal covered investment adviser, by any means or instrumentality, directly or indirectly:
>
>         (1) To employ any device, scheme or artifice to defraud any client or prospective client;
>
>         (2) To engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; or
>
>         (3) To engage in any act, practice, or course of business which is fraudulent, deceptive or manipulative." 815 ILCS 5/12(J) (West 2012).

- 7 -

¶ 30    In the case *sub judice*, Van Dyke disputes he acted as an investment adviser under section 12(J) of the Act. However, the Secretary's determination that Van Dyke acted as an investment adviser in the transactions at issue is supported by the record. Van Dyke was a registered investment adviser under the Act at all relevant times, and he marketed and otherwise held himself out to clients as a registered investment adviser, "Certified Senior Adviser," and "nationally recognized retirement educator." Moreover, the Insurance Code does not prohibit licensed insurance producers from also acting as investment advisers when selling indexed annuities. 215 ILCS 5/500-15(a), (b)(2) (West 2012). Because Van Dyke acted both as a registered investment adviser under the Act and as a licensed insurance producer under the Insurance Code, he was subject to the legal duties under each regulatory regime, including the Act's antifraud provisions.

¶ 31    Van Dyke also contends section 12(J) (815 ILCS 5/12(J) (West 2012)) requires that he provide the offending advice "for compensation." See 815 ILCS 5/2.11 (West 2012) (defining "investment adviser" under the Act). However, the evidence indicates one client paid him a $1975 retainer for future investment advice and he received over $360,000 in commissions for the sales of the annuities. Thus, he provided such advice for compensation.

¶ 32                                    D. Findings of Fraud

¶ 33    Van Dyke argues the Department failed to prove fraud and it acted arbitrarily or, in the alternative, any findings of fraud are against the manifest weight of the evidence. We agree.

¶ 34    In an administrative hearing, the Department's burden of proof is by a preponderance of the evidence. 5 ILCS 100/10-15 (West 2012). "An administrative decision should not be overturned unless the agency exercised its authority in an arbitrary and capricious manner or the decision is contrary to the manifest weight of the evidence." *Springwood Associates v. Health Facilities Planning Board*, 269 Ill. App. 3d 944, 947, 646 N.E.2d 1374, 1375 (1995).

¶ 35    In determining whether an agency acted arbitrarily, it must be remembered that "administrative agencies must follow their own rules as written, without making *ad hoc* exceptions or departures therefrom in adjudicating." *Springwood Associates*, 269 Ill. App. 3d at 948, 646 N.E.2d at 1376. "Agency action is arbitrary and capricious if the agency contravenes the legislature's intent, fails to consider a crucial aspect of the problem, or offers an explanation which is so implausible that it runs contrary to agency expertise." *General Service Employees Union, Local 73 v. Illinois Educational Labor Relations Board*, 285 Ill. App. 3d 507, 515, 673 N.E.2d 1084, 1090 (1996).

¶ 36    Here, we find the Secretary's decision is arbitrary, capricious, and against the manifest weight of the evidence. The Department failed to set forth any applicable rules or written criteria to evaluate insurance annuities that would indicate its expertise in that area. In contrast, the Department of Insurance has enacted detailed regulations addressing suitability factors that insurance producers and insurance companies must adhere to when offering or selling annuities, including replacement annuities, to Illinois consumers. See, *e.g.*, 50 Ill. Adm. Code 3120.50 (2011) (setting forth the duties of insurers and insurance producers in recommending a purchase of a security); 50 Ill. Adm. Code 909.85 (2008) (setting forth provisions regarding advertising and marketing annuities). The purpose of the suitability regulations "is to set forth standards and procedures for recommendations by insurers or insurance producers to consumers that result in a transaction involving annuity products so that the insurance needs

and financial objectives of consumers at the time of the transaction are appropriately addressed." 50 Ill. Adm. Code 3120.10 (2011).

¶ 37    In the final order, the Secretary did not identify any regulation other than section 130.853 of title 14 of the Illinois Administrative Code (14 Ill. Adm. Code 130.853 (1997)), which states as follows:

> "Effecting or causing to be effected by or for any client's account, any transactions of purchase or sale which are excessive in size or frequency or unsuitable in view of the financial resources and character of the account, shall constitute an act, practice, or course of business on the part of the registered investment adviser or its representative effecting such transactions or causing the transactions to be effected that is fraudulent, deceptive or manipulative."

However, section 130.853 has nothing to do with an insurance producer selling an annuity to an insurance client. Van Dyke did not manage any accounts for his insurance clients. He acted as an insurance agent in the facilitation of the sale of insurance contracts.

¶ 38    Ray DeWitt, the Department's securities enforcement director, testified he participated in Van Dyke's audit. He compared the aggregate "dollar amounts" of the old annuities to the new annuities and included columns for both the new contract with a bonus and the new contract without a bonus. When asked why he made the distinction between the bonus or lack thereof, DeWitt stated he was told to do so by the Department's attorney, David Finnegan. He stated "the Department doesn't recognize a bonus as a reason for switching an annuity." The Department, however, fails to cite a rule or regulation to support this view.

¶ 39    The evidence presented by the Department also fails to show Van Dyke fraudulently induced 21 clients to purchase replacement annuities. The Department's "evidence" involved looking at replacement annuities containing surrender charges and bonus recapture fees and adding up the numbers. Susan Lamb, an associate actuary for the Department of Insurance, testified she was familiar with the suitability requirements for the replacement of indexed annuities. She also stated as follows:

> "The adviser needs to consider the individual's financial situation. Every individual's financial situation is unique, they have different needs, they have different expectations. They also need to very clearly consider the features in the current annuity contract versus the features in the potential replaced contract."

¶ 40    Here, there was no consideration as to whether the new annuities were suitable based on each individual client's unique needs and financial status. DeWitt testified he did not take into consideration any of the features of the new annuities that were not included in the old annuities. Instead, he "was just putting hard numbers down." He also stated he did not conduct "any analysis" of the annuities. Dr. Edward O'Neal, a Department consultant, testified he did not review any of the individual annuity contracts or other documents to compare the features of the original annuities to the new annuities. Instead, he only considered the surrender charges and the market value adjustment. Thus, DeWitt and O'Neal both admitted they neither performed nor were asked to perform the individualized suitability comparison described by the insurance expert Lamb.

¶ 41    It should also be noted that of the 14 Van Dyke clients who testified, none of them had any complaints. All of Van Dyke's clients reviewed and signed application forms, rider forms, and contract forms approved by the Department of Insurance acknowledging they were aware of

the various benefits, features, surrender charges, and fees associated with the replacement annuities. As just one example, George Perry testified he was not satisfied with the performance of his ING annuity, and Van Dyke suggested an annuity with Aviva. Perry stated Van Dyke explained the surrender penalty on the ING annuity but "there was a bonus on the Aviva which more than made up for the loss in the early retirement." Perry stated he made the decision to switch and he "came out ahead on the deal," as the value of the Aviva annuity had gone up "drastically."

¶ 42 We find the evidence presented failed to establish Van Dyke violated the Act in the sale of the indexed annuities in this case and, more specifically, that he perpetrated a fraud on his clients. As such, the Secretary's final order revoking Van Dyke's investment adviser registration, prohibiting him from offering or selling securities in Illinois, fining him $330,000, and requiring him to pay witness fees of $23,500 must be reversed.

¶ 43                                   III. CONCLUSION

¶ 44 For the reasons stated, we reverse the circuit court's decision and the Secretary's final order.

¶ 45 Reversed.